United States law or Philippine law? That's interpreting United States law. It's saying if you have a United States statute... What I'm suggesting is that, following up on Judge Paez's question, is that we don't know how Philippine law would apply in the same situation. But that's not the point. What the point in that line of cases is if you can't adjudicate an American claim, and the governing documents in this case, and here what Holland America is saying is this is governed by the collective bargaining agreement and the standard terms. They say it's limited to the application of Philippine law. They're not applying it. They can't expand it. That's what Provision Article 19.7.7 says. The arbitrators can't expand the scope of what they look at. It seems to me, though, that if you do have to appear in an arbitration proceeding in the Philippines, and there was a breach of contract, here's why, and the arbitrator agrees that there's a breach of contract, and the seaman says, ah, I also need, I was discharged in the ports of the United States, and I'm entitled under U.S. law to a penalty. And the arbitrator says, hmm, I agree, and I'm going to award it. All I can do, Your Honor, is point you to Holland America's position, which is in tab 2, when they say that's not the way it works. And they are bound by that. There's a judicial estoppel principle that applies. In my last few seconds, if I can wrap up, I would like to ask the Court to also look at the Griffin v. Oceana Contractors case, which is 458 U.S. 564. That's the leading United States Supreme Court case on the penalty wage under the Seaman's Wage Act. And they classify that, just like Brooklyn Savings Bank, as a separate claim that the claimant is entitled to bring in court. That's what both of those cases are about. They've grown out of this law. And the public policy, if you permit the arbitration, would allow a fractured proceeding, as Mr. Rummage just laid out, that is both cumbersome and is not likely to serve the underlying purposes of protecting Seaman. Why a fractured proceeding if it's exactly the same kind of proceeding that Mitsubishi involved or thought would happen? Mr. Rummage, I believe, just said that he – that if the matter – let me just – as I understand what his position is now, if the matter is referred to the Philippines, they won't adjudicate the statutory claim, they'll figure out the contract claim, then they come back here. That's highly inefficient. That's not what he said. That's not what he said. What he said was what is absolutely consistent with the Arbitration Act, which is it goes to arbitration, the arbitral panel makes a decision, and then in order to enforce that decision or to set it aside, one must go to district court. That's consistent with all of the arbitration proceedings in the United States. I understand, Your Honor, and it's our position, though, that if you really read Payette carefully, it says you cannot cleave away the statutory claim under the documents in this case, the contract in this case. The arbitrators have no authority to adjudicate a U.S. statutory claim in the Philippines. That doesn't mean that theoretically in another case they might, but in this case they can't. Thank you, counsel. All right. The case of Balin v. Holland America line will be submitted, and we will take up Tobin v. State of Washington. You may proceed, counsel. Good morning. May it please the Court, my name is Paul Lindenmuth. I'm here on behalf of the appellant, Plaintiff's Tobin, in this case. I would like to try to reserve three minutes, if possible, for rebuttal. This matter comes to you on a decision by the District Court on a summary judgment motion dismissing plaintiff's claim pursuant to 42 U.S.C. section 1983. Of course, because it's before you now on a dismissal based on summary judgment, the review is de novo with the facts and inferences from those facts having to be construed in a light most favorable to the plaintiff. The underlying claim in this case was brought pursuant to 42 U.S.C. section 1983 and was a substantive due process claim based on a state-created danger theory. The state-created danger theory had its origins in the U.S. Supreme Court's opinion in DeShaney and ultimately was synthesized in this Court's opinion in Wood v. Ostrander some 20 years ago. What year did this incident happen, I forget? If I recall correctly, 2004. Okay. What's your best case that says that the law governing this particular claim was clearly established? I cited you to my supplemental authority a case called Vineyard v. Wilson. Vineyard v. Wilson talks about how we go about determining whether a law is clearly established. They provide three basic ways of doing it. One is through clear statutory language or constitutional language. The second one is through principles that are well articulated and espoused and not necessarily tied to specific factual scenarios. And then you go to cases close or directly on point type issues. It's supposed to be sufficiently clear that a reasonable governmental official would understand that their conduct would violate the Constitution. Correct. I'm asking you what case, if you were an official in the State Department that's involved here, of licensing of these child care facilities, what case would you point to and say, ah, this sort of thing? When dealing with a clearly established lie issue, I would suggest the second Vineyard prong is probably the best one to look to because we have these basic principles that establish certain things. The State cannot create and or exacerbate dangers and expose citizens to that. What if you hear a case? A case that would probably be the closest would be, well, we have the Pinella case and we have the Munger case. O'Connell was a lot different. I know O'Connell very well. They're all factually different cases, Your Honor, when these cases are found to implicate these claims. Ultimately, though, in all but one instance in the Ninth Circuit, they found the law to be sufficiently clearly established to deny qualified immunity, starting with Wood v. Ostrander. But Wood, Johnson, Grubbs, all of these particular situations don't seem to envision here now an agency of the government, not the police, not in each one of these cases. I went through to find one where we could find an agency. Now we're talking about the Department of Social and Health Services and an inspection. The closest case I can find to where the Department of Social and Health Services is involved is DeShaney. And DeShaney seems to suggest there's nothing in there that would suggest that this is even a violation. Well, DeShaney dealt with, I think, just passively indicating that some child was being a victim of abuse and not intervening. Here we have a situation where within the State of Washington you don't have a daycare unless there's state intervention. If they don't issue a license, you don't get a daycare. I have a question. What is the general, under the Washington Code, what is the purpose of these inspections? The purpose of these inspections is to make sure I... Read the code. What does the code say the purpose is? The purpose is to make sure that they're safe. Well, as I understood it and I read it, it assures the users of such agencies, the parents, the community at large, and the agencies themselves, that adequate minimum standards are maintained by all the agencies. Of course, the minimum standards are safety standards. Well, minimum standards. Now, we're suggesting then with that Washington Revenue Code that this is a violation of constitutional rights in this particular instance? The fact that they failed to follow their own regulations and licensed an unsafe daycare next to a lake without the fencing that the regulations required is certainly a brick in the wall. What we have to do is we have to look at the entire fact pattern and make a determination as to whether or not they created or exacerbated the danger. These are always going to be fact-specific cases. The question is, did the state have a hand in what occurred here? And if we start looking at the facts of this case and peeling back the onion, we see conduct that is a level of, that is factually, at least a factual issue, that rises to the level of deliberate indifference. Counselor, if we were, I would agree with you. If we were, if you were asking us to extend the law to cover a licensing situation such as this and the fact circumstances as this, I just think that it would be a really much closer question. But given the requirement of demonstrating that's already clearly established, I just, I don't see a case that comes close to this scenario. In the situation? There's a lot of negligent and terrible misconduct by the state here. Right. And it was a terrible tragedy. But there was never a case for a regulation in Wood v. Ostrander either. No, I'm saying a case law would have to be, I think, extended to embrace a situation where it was a general licensing regulation that applied to the public at large. I mean, in all of the other cases, and it's generally the police, although it's sometimes another government agent, that they are placing a particular individual in a particular state of danger that that individual would not have been in but for the state's action. This is somewhat different, right? Well, I disagree to the extent that that's not the way it's actually really worked and developed over the years. We have Wood v. Ostrander, police misconduct, then it's followed by L.W. v. Grubbs, which is an employment situation. What we do is we look to the basic elements of what is this claim and what did the state do. And then we make an analysis as did the state have a play in the creation and exasperation of danger. We look at the elements essentially of the claim, boom, boom, boom, do we meet these elements or are there factual issues in that regard? So to start, and I think there was some discussion in Wood v. Ostrander about when examining this situation, it's not making crowd lawyerly distinctions. I mean, it could have been, do we make a distinction between the fact that it was the WSP that left Ms. Wood out on the highway or the fact that it was the Tacoma police? I mean, at what point do you start parsing these things down and saying that in order to make this claim, it has to be so narrowly tailored? So are you suggesting that the state is creating a danger, unknown danger right now to unknown people possibly because of all these licenses that were issued by these people who were clearly derelict in their jobs? Well, they were certainly, they created a danger to the specific class of people that would have been in attendance at that daycare. That's not everybody on the planet. It's a very limited group of people. They created, essentially they created a, you know, if the state of Washington was sowing landmines in the lawn in front of this building and we can't predict who's going to step on that landmine, you would still say that they created danger. And I don't think it's a different case, but you would have a problem imposing liability under those circumstances. Here the danger is the facility. And what separated Gabriel Tobin from the general public is how this thing evolved. There are specific requests of one of the licensors, as you may recall on the record, saying, look, I've got a problem with my front door. And if you look at it, the front door, mandatorily unlocked, directly looked out to a lake directly across the street. So, and there's some indication she was talking about Gabriel Tobin had been trying the door. So there is some facts taking him outside of the general public, so to speak. And the situation out of just, you know, hypothetically anybody could be hurt. What they created here was essentially a death trap. If we look at what they did, it is fairly egregious. I mean, they put, there's a daycare directly across the street from the lake, and they tell the daycare provider, it is mandatory that you have your front door unlocked. Right on the other side of that front door is a play area of the daycare. What's odd is that she actually had the door locked. Well, there's some, she had a flip deadbolt, you know, not a double key deadbolt, but one that you could just flip. And apparently he had been able to flip that over. And there's some ambiguity as to the credibility of whether it was locked or not locked. I mean, that is ultimately a factual issue, I believe. But our position in this case is, look, the court went beyond its prerogative in this case and decided the facts. Ultimately, you can look at questions of causation or temporal relationships like they do in the other circuit cases. But what we have here is a fairly direct relationship to the harm created. There's no question that you have but-for causation here. And really what's required under constitutional jurisprudence is the setting into motion a series of events that leads to the deprivation. Are we to let old Donna Hugh out simply because you did not say anything about that person in your briefing? Your Honor, that was, the district court did not parse out the part. Well, my question is- Parse out the part. Are we to let him out on the creation of the hazard? You didn't mention him in your briefing, or her. I don't know what it is. Your Honor, I think there is some issues there. Because the district court did not address the individual liability- Did you address old Donna Hugh in your first brief? No, I don't think I parsed it out that way, Your Honor. What I would say, old Donna Hugh's involvement was the very last part of the puzzle in this case, which I've characterized as the state's effort to essentially cover up the fact that they even had a regulation when they start writing their reports. They're indicating, well, gee, maybe we should have a regulation requiring fencing between daycares and lakes, when they've had this regulation on the books already for some five years. Well, the regulations don't seem to make much sense, but that's a whole other issue. Is there evidence in the record as to whether the Tobins would have placed their child in this particular home if it had not had a state license? Absolutely. If you look at the deposition of Jennifer Tobin, she was emphatic on that fact. In fact, she had gone through a state referral line in order to find state-licensed daycare, and that's how she found Little Fish's Daycare. She was directed to the daycare by the state. And she had also interviewed a couple other daycare providers that were also licensed. And I think she recalled, I think this was in her deposition, some of them were so bad, she had her little boy in one of those pull-up car carriers that you can carry around. It was so bad, she wouldn't even put the baby down on the floor. So she went to a state resource to referral to get a state license? That is in her deposition, yes. I don't know. I think my time's up. I think it is. Thank you very much. If possible, a minute. Okay. Right, you can have a minute for rebuttal. Good morning, Your Honors. May it please the Court, my name is Peter Hellenberg. I'm here on behalf of the appellees, the named employees from the State of Washington. Decisions by state officials to license a particular facility such as a daycare as part of the state regulatory scheme do not create substantive due process rights on behalf of individuals that are injured in these facilities. The district court was correct in granting the summary judgment motion on that basis that a licensing decision does not create a state-created danger because it does not arise to the sort of affirmative conduct that is required in order to satisfy the state-created danger exception to the Deshaney Principle. Affirmative conduct, as this circuit has made clear, requires that a state actor affirmatively place a particular plaintiff in a particular and individualized position of danger. Where does the principle that's been enunciated throughout these cases talk about a particular plaintiff? I think it's inherent in all of the decisions. It's true that that happens to be the fact scenario, but then again, it's not necessarily part of the principle. The principle just is that the state action must have affirmatively placed the plaintiff in danger and that he or she was exposed to danger he otherwise would not have faced. Didn't that happen here? No, not in the sense of the state-created danger. The difference between this case and sort of granting a license and then having people move forward from the licensing decision, the difference in the situation is, in fact, that the state-created danger, the affirmative conduct does require this creation. You find a person in a place or you put a person in a place worse than you found them. So there's this direct contact that flows between the state official and the subsequent plaintiff. It does not rely, none of the Ninth Circus cases rely on somebody else's unreasonable or their failure to use reasonable care, their subsequent negligence, in order to fulfill the substantive due process right or create a substantive due process right by completing the state-created danger. One of the analogies that's been used has been the plaintiff used in the briefing, I believe, was sort of referenced to a snake pit. This is as though the state just would have thrown somebody into a snake pit. Well, that's not what happened here. If we could use that analogy, the analogy of, say, licensing somebody to have a snake pit on their property, but as long as they took reasonable precautions to make sure nobody would be hurt. And if somebody fails to use those reasonable precautions... The state fails to enforce those precautions. Well, but no, what happens is that somebody fails to do what's required of them, which is to supervise, to make sure that nobody goes into the snake pit. That is different than what we have in all of the Ninth Circuit cases where somebody is required to put somebody in a position, dragging them off the porch and putting them away from public view and calling off medical attention. How do you respond to opposing counsel's analogy that this is like planting a bunch of mines on the lawn of the federal courthouse? That analogy simply doesn't apply to the facts of this case. Why? How is it different? Because the state didn't place a bunch of mines in this. They licensed a facility, but they didn't place... Outside the front door of a daycare lies the whole world as a danger. There's roads, there's pedophiles, there's lakes. The whole world is a danger outside the front door of the house. So when a daycare is licensed to fulfill the purposes of the statute, which are multiple, increased safety, as well as for minimum standards, fencing is simply not required. You rely on the supervision. Could they have required fencing? Probably not. They wouldn't license you unless you put a fence around the front door. They could have said that, and that could have been an appealable decision to the Office of Administrative Hearings. We're going to revoke your license if you don't put this fence up. The property owner could say... Well, they licensed it years before. Right. The property owner could say that the... Could say, well, I disagree. I don't think the regulation requires an appeal. They could have said that. But if it's not a minimum requirement, then they can't impose that desire on a home as part of the licensing process. And, again, we're talking about a factual scenario that is far different from anything that the Ninth Circuit, anywhere they've gone in the state-created danger cases. It's interpreting state regulations, which may change over time, and how these regulations are interpreted and then applying them to a situation of licensing a facility, just as you would license daycares, drivers, everybody who's licensed under a state regulatory scheme, is completely different than every situation that the Ninth Circuit has adopted the state-created danger in which a particular official has created specifically a danger to an individual that the individual... Are you arguing it's not clearly established now? Are you still arguing there's no constitutional violation? Well, I'm arguing at this point that there's no constitutional violation. As I'm sure this Court is aware, under the recent Pearson v. Callahan decision on the United States Supreme Court, the mandatory saucier two-step test has now become essentially optional. The first question about whether or not there's a constitutional right that's been violated has been...that's now been made optional under this Pearson decision. The Court could ostensibly skip right to whether or not it was clearly established and determine that it wasn't clearly established, which in this case would be very easy to do because there is nothing which would indicate that licensing a facility... So then why would we want to try and answer the hard question? Because, well, I'll leave it to you, but whether or not there's a constitutional violation is something that would be... The second question is easy. There's nothing which would indicate that licensors should not license a particular facility because it gives rise to a state-created danger. There's nothing that can be pointed to. That's not even close. But the question then whether or not it is constitutional, we are asking that the Court analyze and determine that there is no constitutional violation under these circumstances. It's a very difficult question whether or not the state-created danger doctrine would extend to this type of situation, especially in the area of child care, because you license these particular places. You put the state infirmature on this is a licensed facility. I think that people think that if it's a licensed facility, it's state-approved. It's approved by Washington. If it's not, it's not, and that gives them a measure of reliance on the guarantees of safety of placing their kid there as opposed to the one down the street that's not licensed. Then you go a little further. You have your referral board that lists the state-licensed daycare, which is saying, okay, you go to these places and they're going to be safer. Your child's not going to be hurt there. So I think it's a very difficult question, a very close question as to whether or not the doctrine would extend to these particular areas, especially when you're talking about the safety of a child, which is considered part of the state's obligation to protect the health and safety of children. It's just very difficult. I don't know why you keep arguing that it just doesn't apply. There's a lot of difficult, thorny issues here. Okay. The state does not have an obligation to supervise the children on a day-to-day basis to make sure they're safe. That's the daycare providers in the first place. In the second place, the state resource. Each one of these steps remove this case from the established night circumstances. You're going to hold yourself out as licensing, thereby guaranteeing certain minimum standards of safety at these places, and you fail to do. The people who were the inspectors clearly were derelict. They failed to do the proper inspections and require the proper things from the home. Then why shouldn't there be some kind of exposure to liability for that? Well, there's exposure under state law to liability. Potentially that matter has been tried to a jury. That leads me to the question of what is the status of the remanded state causes of action? That case has been tried. The jury returned a verdict of $11.7 million, and that verdict is on appeal to the Washington State Court of Appeals presently. I thought that it might be something like that. Okay. Now, but there's something in my remaining 25 seconds I'd like to touch on very quickly. The state resource identified a number of different licensed facilities in a particular area, and the plaintiffs did go and examine a number of these different facilities and then chose this particular facility because they thought it was the safest. I'm not saying that's put blame on the plaintiffs for this situation at all. However, go back and look at it. I'm going to run over just by a second. The Kennedy decision, the highly debated Kennedy decision out of this circuit, which talked about, and there's a reason I'm bringing this up, it talked about the timeframe between the police officers notifying the family of the violent 13-year-old and then notifying the family as per their request that this investigation had begun in earnest so they could get out of there because they anticipated the danger. One of the debates was centered around this timeframe to which the court specifically said that because of the circumstances, Mrs. Kennedy did not have a reasonable opportunity to protect her family by getting out of this situation. This situation is far different than that. I see your argument is as there were intervening causes here. The state's action isn't the action that necessarily caused the injury. That's what your argument seems to be. Right. And so if you were to adopt a constitutional violation here under the state-created danger theory by saying that the state set in series these motions of events that led to this, this is far different than any other Ninth Circuit decision in this regard because it relies on a number of other factors in place, most notably somebody's negligence down the road two years when Lisa Fish simply failed to supervise her children. And that's far different than anything, which is why I keep arguing that there's no constitutional violation here, Your Honor. We understand your argument. Thank you so much, counsel. Thank you. Yes, you may have a minute. Your Honor, I recall again the language of the statute that Judge Smith was talking about and it indicates that the safety of children is paramount. If our laws are to have any meaning and our Constitution is to have any meaning, it has to mean we have to protect our children. What happened here was a creation or exacerbation of danger. What is ultimately the issue here is a jury question, and the jury question will be is whether these people, and $11.7 million is an indication of egregiousness and egregious damage to these parents and to this two-and-a-half-year-old boy that drowned and had a very lonely death. Under circumstances where you had an unlocked front door looking on a lake in the middle of the summer and you had a little boy thinking that that would be a fun thing to go down to and play at. Were the state officials defendants in that state case? They were individually named defendants. We kept them that way even though under negligence theory we didn't necessarily have to. It's optional and we did. And the split was I think they found the daycare provider about 19% responsible, the supervisor equivalent 20% responsible, and then the individual licensors 10 and 10 and then some undefined amount for the state itself. A license is not a fire-and-forget missile. It has obligations and responsibilities attached to it, and it does provide assurances to parents. And what the issues here are are factual issues. Did the state set into motion a series of events that resulted in a constitutional deprivation, which is the death of a 2-year-old? Then the question we have to ask ourselves is can we show deliberate indifference? And what deliberate indifference really means is a state official is conducting their duties in a manner which just says, I don't care. I don't care if it's dangerous. And I think a jury with appropriate instructions on this claim could found that these people that we've entrusted with the safety of our children just didn't care. Thank you. All right. Thank you, counsel. To have this state of Washington be submitted, we're going to take about a 10-minute recess at this point. Thank you.
judges: Wardlaw, Paez, Smith N. R.